UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

KEVIN A. O'CONNELL

        Plaintiff,

     v.                        **REPORT AND RECOMMENDATION**
                                      **1:06-CV-1113 (LEK)**

MICHAEL J. ASTRUE[1]
COMMISSIONER OF SOCIAL SECURITY,

        Defendant,

## Jurisdiction

1.  This case was referred to the undersigned for Report and Recommendation by the Honorable Norman A. Mordue on November 18, 2008, pursuant 28 U.S.C. § 636(b)(1)(B), and is presently before the Court on motions for judgment on the pleadings as supported by Plaintiff's Brief of February 16, 2007 and Defendant's Brief of May 16, 2007.[2] This Court has jurisdiction under 42 U.S.C. § 1383(c)(3).

## Background

2.  Plaintiff Kevin A. O'Connell challenges an Administrative Law Judge's ("ALJ") determination that he is not entitled to disability insurance benefits ("DIB") under the Social Security Act ("the Act"). Plaintiff alleges he has been disabled since October 31, 1996, because of dysthemia, severe depression, alcoholism and drug addiction (R. at 45).[3] Plaintiff has met the disability insured status requirements of the Act at all times on or before the date of the ALJ's decision.

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.
[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"
[3] Citations to the underlying administrative record are designated as "R."

**Procedural History**

3.  Plaintiff filed an application for DIB on September 3, 1997. His application was denied initially on February 4, 1998 and, under the prototype model of handling claims without requiring a reconsideration step, Plaintiff was permitted to appeal directly to the ALJ (R. at 36-40). See 65 Fed. Reg. 81553 (Dec. 26, 2000). Plaintiff filed a timely request for a hearing before an ALJ, and on July 21, 1998, Plaintiff appeared before an ALJ (R. at 309-24). The ALJ considered the case *de novo*, and on September 11, 1998, issued a decision finding that Plaintiff was not disabled (R. at 15-24). Plaintiff, then represented by counsel, requested review by the Appeals Council on December 10, 1998, and the Appeals Council denied Plaintiff's request for review on April 6, 2000 (R. at 3-13). On September 13, 2000 Plaintiff sought an appeal by filing Case No. 6:00-CV-1384 in this Court. Plaintiff's Brief, p. 5. By stipulation of the parties, the case was remanded to the Commissioner on December 31, 2001 for further administrative proceedings. Plaintiff's Brief, pp. 5-6. Based upon the district court remand, the Appeals Council sent the case back to the ALJ in February of 2002 (R. at 345-47). The Appeals Council ordered the ALJ to hold a new hearing, develop the record and issue a new decision, specifying:

> The Administrative Law Judge will determine whether the claimant has a severe mental impairment independent substance abuse [sic]. He will obtain evidence from a medical expert, preferably a board-certified psychiatrist. He will also update the record and evaluate all of the evidence, including all of the opinions of the state agency medical consultants. Also, the Administrative Law Judge will consider Public Law 104-121 which instructs that if limitations resulting from a substance abuse disorder cannot be disentangled from those resulting from other mental impairments, a finding of "not material" is appropriate.

(R. at 346).

4.  On October 30, 2002, a new hearing was held before the ALJ (R. at 519-85). On February 27, 2003, the ALJ found Plaintiff not disabled (R. at 329-41). Plaintiff again filed for review by the Appeals Council on February 28, 2003, and the Appeals Council affirmed the ALJ's decision on August 12, 2006 (R. at 325-27A). The ALJ's February 27, 2003, decision became the Commissioner's final decision in this case when the Appeals Council denied

Plaintiff's request for review (R. at 332-41).

5.  On September 18, 2006, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court to review the decision of the ALJ pursuant to Sections 405(g) and 1383(c)(3) of the Act, reverse the decision of Defendant, and grant DIB benefits to Plaintiff. The Defendant filed an Answer to Plaintiff's Complaint on December 26, 2006, requesting that the Court dismiss Plaintiff's Complaint. Plaintiff submitted a Memorandum of Law on February 16, 2007. [hereinafter "Plaintiff's Brief"]. On May 16, 2007, Defendant filed a Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. [hereinafter "Defendant's Brief"]. After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

6.  For the reasons set forth below, it is recommended that the Plaintiff's motion for judgment on the pleadings be GRANTED in part and Defendant's cross-motion for judgment on the pleadings be DENIED.

### Facts

A.      **Treating Sources**

1.      **St. Peter's Hospital 1996**

7.  From April 17 to April 21, 1996, Plaintiff stayed in St. Peter's Hospital Detoxification Unit because he had planned to commit suicide (R. at 80-81, 94).[4] Plaintiff reported a thirty year history of alcohol problems and a twenty-seven year history of drug problems (R. at 90). In response to questioning, Plaintiff reported a history of child abuse, using alcohol or drugs beginning at age eleven, and using other street drugs (R. at 91-93).[5] Plaintiff also reported having lost a job because of chemical dependence. Id. The clinician assessed Plaintiff's challenges to a successful rehabilitation as, no Alcoholic's Anonymous ("AA") sponsor, difficulty

---

[4] The administrative transcript contains additional medical records from St. Peter's Hospital, and although the pages are marked "best copy obtainable," they are unreadable (R. at 83-85).
[5] Many of Plaintiff's responses are illegible because of the poor quality of the photocopy (R. at 91-93).

dealing with change, difficulty with trust, uncomfortable socializing after AA meetings, and isolation. Id. Elizabeth Terry, M.D. assessed Plaintiff on April 19, 1996 (R. at 82).[6] Plaintiff reported that he was prescribed Zoloft[7] and trazodone[8] by a clinic in Saratoga and that these drugs "benefit him as long as he is not drinking." Id. Plaintiff reported to Dr. Terry two previous suicide attempts in 1983 and 1994 and a plan, formulated the day before his admission while he was acutely intoxicated, to shoot himself. Id. Dr. Terry diagnosed Plaintiff with polysubstance dependence and depression not otherwise specified. Id. Plaintiff was discharged on April 21, 1996 with instructions to continue taking Zoloft and trazodone and to attend daily AA meetings (R. at 79). Jose M. David, M.D., signed off on Plaintiff's discharge summary (R. at 78).[9] Dr. David's final diagnoses of Plaintiff were: alcohol dependence, history of heroin abuse, history of intravenous drug abuse, history of cocaine abuse, depression, and history of alcohol withdrawal seizures (R. at 77). Dr. David indicated that Plaintiff's medical history was "significant for a history of depression and anxiety." Id. He noted that in the two weeks prior to detoxification, Plaintiff was drinking one 12-pack of beer and sometimes a quart of Bourbon daily. Id. Prior to that, Plaintiff had been sober for about five and half months. Id. Dr. David also noted that Plaintiff had been sober from 1985 to 1991. Id. While he was hospitalized Plaintiff was seen by a psychiatrist who agreed he should continue his trazodone and Zoloft prescriptions (R. at 78).

### 2.    Benedict Health Center 1996-1997

Plaintiff was treated by Marta Rios-Benitez, M.D., at the Benedict Health Center, from December 17, 1996 through June 3, 1997 (R. at 290-91, 293-302, 304).[10] Treatment notes

---

[6] The record does not indicate a specialty for Dr. Terry.
[7] Zoloft is a preparation of sertraline hydrochloride, indicated for use in treating depression. Physician's Desk Reference 1854-55 (47th ed. 1993).
[8] Trazodone hydrochloride is an antidepressant chemically unrelated to tricyclic, tetracyclic, or other known antidepressants and is indicated for the treatment of depression with or without prominent anxiety. Id. at 1456.
[9] The record does not indicate a specialty for Dr. David.
[10] The record does not indicate a specialty for Dr. Rios-Benitez.

indicate Dr. Rios-Benitez was monitoring Plaintiff's physical condition and medications, but not providing treatment for mental health or substance abuse problems. Id. She ordered blood tests and an abdominal CT scan, which were all within normal limits except for slightly elevated cholesterol (R. at 294, 296-302). Dr. Rios-Benitez's notes indicate Plaintiff had a history of depression and substance abuse (R. at 294) and that as of April 1997, he was being treated for "severe depression" with Zoloft and trazodone (R. at 293).

### 3.   Veteran's Affairs  Medical Centers ("VAMC") 1995-1998

Plaintiff has been treated at several VAMCs at various times between 1995 and 1998 (R. at 131-288, 292, 303, 305-06, 391-458).

Plaintiff was treated for rehabilitation as an inpatient at Albany VAMC from October 24, 1995 to November 21, 1995 (R. at 305-06). Plaintiff was diagnosed with alcohol dependence, polysubstance dependence, opiate dependence, and depressive disorder not otherwise specified (R. at 306). During his treatment, Plaintiff received alcohol counseling, individual therapy, group therapy, recreational therapy, and continued to take Zoloft and trazadone. Id.

On January 27, 1997, Plaintiff was seen by clinical social worker, Glenn T. Gilbert, CSW, the Executive Director of Community Mental Health Initiatives at Albany VAMC (R. at 303). Mr. Gilbert indicated that Plaintiff had long term problems with depression, chronic substance abuse, and was currently living in a group home in Latham. Id. Plaintiff told Mr. Gilbert that he self-medicates his depression with drugs and "although he has utilized psychiatric counseling and medication in the past, he has always resorted to drug abuse to resolve his severe depressive episodes." Id. Plaintiff reported about twelve treatment programs over the course of his lifetime. Id. At this meeting, Plaintiff decided to enroll in compensated work therapy ("CWT"), a vocational program at the VA. Id.

On May 15, 1997 Plaintiff was again seen by Mr. Gilbert to assess his ability to cope with his depression (R. at 292). Plaintiff was expressing anger and experiencing stress from his

5

vocational therapy assignment. Id. Plaintiff identified 1980-82 as the time period of his first major depressive episode and indicated he was not sure he ever recovered from it. Id. Plaintiff reported a "chaotic" childhood in which he experienced physical and emotional abuse and a family history of depression. Id. Plaintiff reported using drugs and alcohol to deal with his depression. Id. Plaintiff stated he tends to isolate himself when he gets depressed, secluding himself in bed, unplugging the phone, and "shutting down." Id. Plaintiff reported having no real friends and having a pervasive sense of hopelessness. Id. Mr. Gilbert referred Plaintiff for cognitive therapy. Id. Upon referral in July 1997 to clinical social worker, Phyllis Hundert, CSW, performed a psychiatric assessment of Plaintiff (R. at 287).[11] Ms. Hundert observed Plaintiff's mood was very depressed, Plaintiff had suicidal thoughts but only vague plans, and Plaintiff had poor appetite and poor sleep. Id. Plaintiff admitted to drinking for the past four days and worried he would relapse on cocaine, which he had not used since December 1996. Id. Ms. Hundert diagnosed Plaintiff with alcohol abuse, major depression recurrent, and cocaine abuse in early remission (R. at 288). Ms. Hundert assigned Plaintiff a current Global Assessment of Functioning ("GAF") score of 35 and his highest GAF in the past year was assessed as 35.[12] Id.

In early July of 1997, following a relapse, Plaintiff was pulled from his CWT position, had his psychotropic medications adjusted by his psychiatrist, and began a six week intensive CDRP program while remaining in supportive housing (R. at 279, 263-86). In his psychosocial assessment upon admission, Patrick A. Wright, a certified alcohol and substance abuse counselor ("CASAC"), noted that Plaintiff had not been able to maintain any significant

---

[11] Portions of Ms. Hundert's assessment are unreadable due to illegible handwriting and the poor quality of the photocopy. However, a readable portion indicates that this assessment was in response to the referral by Mr. Gilbert (R. at 287).

[12] The GAF scale ranks psychological, social, and occupational functioning on a continuum of mental health, from 1 to 100, with the highest number in the superior range of functioning. A GAF score between 31 and 40 indicates an individual has "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Diagnostic and Statistical Manual of Mental Disorders 34 (Am. Psychiatric Ass'n, 4th ed. 2000) [hereinafter DSM-IV-TR].

autonomy from residential placement or treatment programs since 1991 (R. at 280). Plaintiff

reported a period of five or six months of sobriety after completing an inpatient CDRP in 1995.

Id. Plaintiff relapsed in April or May of 1996 and continued using alcohol and cocaine

intermittently through December of 1996, when he went through detoxification at St. Peter's

Addiction Recovery Center ("SPARC") and was referred to Benedict Health Center. Id. Mr.

Wright noted that Plaintiff had a family history of alcoholism and addiction and a personal history

of sexual abuse at age seven or eight (R. at 281). Mr. Wright diagnosed Plaintiff with alcohol

dependence, cocaine dependence, and major depression recurrent. Id.

During six weeks of intensive treatment, Mr. Wright regularly saw Plaintiff in individual

sessions where they discussed treatment goals, including issues of anger management and

relapse triggers (R. at 270-71, 275-76). Plaintiff's psychiatrist, Sumner Goodman, M.D.,

prescribed Elavil[13] and, on July 30, 1997, increased Plaintiff's dose because he was still

experiencing dysthemia and irritable mood (R. at 275). Dr. Goodman found Plaintiff less

depressed and less irritable on August 6, 1997 and advised Plaintiff to continue Elavil and

cease trazodone if it interfered with his sleep or his depression worsened. Id. As Plaintiff

transferred from his intensive program to a regular outpatient treatment program and moved

from supportive housing to his own apartment, he relapsed and discussed this with addictions

counselor, Theresa Duva, CAC, and Mr. Wright (R. at 268-69). On August 19 and 20, 1997

Plaintiff was discharged from his intensive program to an outpatient relapse prevention program

(R. at 267). Mr. Wright noted that Plaintiff remained isolated and unengaged with sober peer

groups outside of a treatment setting and felt this would hinder Plaintiff's recovery. Id.

Upon discharge from the intensive CDRP, Plaintiff was scheduled to continue therapy

with Ms. Hundert (R. at 252-53, 265-66, 269, 272). Ms. Hundert noted Plaintiff relapsed from

approximately August 25 through September 1, 1997 (R. at 265-66). On September 3, 1997

---

[13] Elavil is a preparation of amitriptyline hydrochloride, which is an antidepressant with sedative effects. Physicians' Desk Reference, supra note 7, at 2372.

7

Plaintiff met with Ms. Hubert and Ms. Duva to discuss admission into another long term treatment program and to have his medications evaluated by his psychiatrists (R. at 264-65).

On September 5, 1997 Plaintiff was admitted at Albany VAMC upon the advice of his therapist Ms. Hundert because he was feeling increasingly restless with suicidal ideation and believed he may relapse on cocaine (R. at 256). Psychiatrist, Petra Langner, M.D., treated Plaintiff during this period and her notes indicate Plaintiff had a similar psychiatric admission from July 1 through July 9, 1997, before his intensive CDRP program. Id. Upon admission, Plaintiff denied acute suicidal ideation and stated he at times became suicidal while using cocaine and feared the consequences of resuming cocaine use. Id. Upon admission Plaintiff was alert, oriented and cooperative, his mood was somewhat anxious and depressed, and his affect was mildly agitated (R. at 256-57). Dr. Langner diagnosed Plaintiff with alcohol dependence, polysubstance abuse, and depressive disorder not otherwise specified, with a notation to rule out dysthemia (R. at 256). Dr. Langner assigned Plaintiff a GAF of 40 upon admission, and 50 upon discharge.[14] Id. During his inpatient stay, Plaintiff received treatment for detoxification, individual therapy and group therapy. Id. As Plaintiff had not required acute detoxification, Dr. Langner recommended he move to SPARC for a thirty day rehabilitation program (R. at 258). Plaintiff complained that Elavil, even with his recent increase, was not effective and wished to change his medication, but Dr. Langner suggested he have his psychiatric medications reviewed at SPARC. Id. Plaintiff was discharged on September 8, 1997 (R. at 256-62).

Plaintiff enrolled in an inpatient SPARC program for approximately two weeks in September 1997 (R. at 254-55). Ms. Matousek, Plaintiff's case manager, maintained contact with Plaintiff's therapist, Ms. Hundert, at Albany VAMC (R. at 252-55). On September 23, 1997, Ms. Hundert closed Plaintiff's case at Albany VAMC, indicating he had been treated there for

---

[14] A GAF score between 41 and 50 indicates "serious symptoms OR any serious impairment in social, occupation, or school functioning." DSM-IV-TR, supra note 12, at 34.

depression (R. at 252). Ms. Hundert stated Plaintiff had completed his inpatient treatment at SPARC and would then continue with outpatient treatment in the Mentally Ill Chemically Addicted ("MICA") group and be provided psychiatric medications through SPARC. Id.

On December 10, 1997, Plaintiff was admitted to the Bath VAMC for observation awaiting a placement in a VA domiciliary (R. at 243, repeated at 231).[15] On December 15, 1997, Plaintiff met with the domiciliary intake coordinator, Roberta Sweet, CASAC, who recorded that Plaintiff was concerned that his treatment plan was focused on substance abuse as opposed to his depression and mental health problems (R. at 247, repeated at 229-30). Plaintiff was also seen by his case manager, Michael Crook, who recorded that Plaintiff had been discharged from the Navy, after eight years and ten months, for alcohol related problems and had undergone two treatment programs while in the Navy (R. at 229, repeated at 247).[16] Plaintiff told Mr. Crook that he was sober from 1985 to 1991 but during that time was still depressed and felt his life was empty. Id. On December 16, 1997 Plaintiff again expressed frustration that his treatment plan at Bath VAMC identified addiction as his primary diagnosis and stated that his drinking was a result of his depression (R. at 223). Plaintiff stated that he was not denying addiction was a problem, but that he did not see it as the primary concern. Id. Plaintiff agreed to work with an addiction therapist. Id. Plaintiff was treated by Ms. Sweet, and Suzanne Miller, R.N. (R. at 225-26). Nurse Miller observed that Plaintiff was not "grossly, clinically depressed" on December 19, 1997 and that he was eating and his sleeping was fair to good (R. at 225). Ms. Miller indicated Plaintiff's diagnosis as mood disorder not otherwise specified versus depression not otherwise specified. Id. Ms. Miller noted Plaintiff might be a candidate for mood stabilizers, but recommended Plaintiff not administer his own medication "until further evaluation." Id.

Plaintiff participated in individual therapy, group substance abuse therapy, nutritional

---

[15] A nurse's note indicates Plaintiff was being observed for "PAD" which may indicate panic anxiety disorder (R. at 243).
[16] Mr. Crook's clinical qualifications are not noted in the record.

counseling, and vocational counseling, as well as physical assessments while treated at the Bath VAMC domiciliary (R. at 161-99, 206-29). On January 5, 1998 Plaintiff met with psychologist, Milton F. Nehrke, Ph.D., and expressed concern that he had received treatment primarily for his substance addiction and not for his depression (R at 216, repeated at 217-18). Dr. Nehrke and Plaintiff agreed to begin individual sessions to address Plaintiff's mental health issues. Id. Plaintiff met with Dr. Nehrke on January 15 and discussed suicidal ideations, which Plaintiff had not experienced in the last week, quitting smoking and caffeine, future employment possibilities and the need to not set up for failure, and interpersonal relationships (R. at 207, repeated at 212).

On January 16, 1998, while Plaintiff was still domiciled at the Bath VAMC, Ms. Miller completed a disability questionnaire at the request of the State agency (R. at 200-05). Nurse Miller recorded Plaintiff's treating diagnosis as mood disorder not otherwise specified versus depression not otherwise specified and later listed Plaintiff's Axis I diagnosis as depression not otherwise specified  and polysubstance abuse continuous (R. at 200-01). Ms. Miller indicated that Plaintiff was being treated for sobriety maintenance and psychiatric monitoring (R. at 201). Ms Miller recorded that Plaintiff's mood was improving and he had decreasing suicidal ideation for the past week, but his affect was somber and worried (R. at 202). Nurse Miller indicated that Plaintiff had good insight and judgment and noted they were "impaired when he uses drugs/alcohol." Id. Ms. Miller indicated that Plaintiff was managing the routine at the Domiciliary and working as an "escort" which provided structure to his daily routine (R. at 203). She indicated that he had suicidal ideation up until about a week prior and stated "Patient has no medical contraindication to work." Id. Ms. Miller indicated that Plaintiff was limited in understanding and memory but wrote that this may improve with longer sobriety (R. at 204). She found Plaintiff was not limited in sustaining concentration, social interaction, or adaptation. Id. Finally, Ms. Miller wrote, "Plaintiff will have a beneficial treatment period re: depression if he

10

does not use alcohol/drugs" (R. at 205). This assessment was not signed by a physician or psychologist. Id.

On January 22, 1998, Nurse Miller performed a psychiatric nursing evaluation of Plaintiff (R. at 197). She noted Plaintiff was more than four weeks sober, his affect was appropriate and his mood appeared stable. Id. Plaintiff had suicidal ideation over the holidays but ideation had decreased over the past week. Id. Nurse Miller noted Plaintiff's energy and sleep were improving on his medication and his behavior and appetite were within normal limits. Id. She noted Plaintiff would continue on Prozac[17] and trazodone. Id.

Plaintiff obtained a pass from the Bath VAMC domiciliary for January 23 through January 26, 1998 (R. at 197). Upon his return on January 26, Plaintiff tested positive for blood alcohol and admitted to drinking while on his pass, reporting that he was upset when his son had refused to see him (R. at 196). Plaintiff met with his therapist, Mr. Sweet, and his psychologist, Dr. Nehrke, and discussed his relapse and plans to continue treatment at the Canandaigua VMAC in a MICA program (R. at 195-96). After this relapse, Plaintiff continued inpatient treatment at Bath VAMC while his treatment team coordinated a transfer to the Canandaigua VAMC (R. at 194). During this time Plaintiff received passes to attend AA meetings and church in the community, from which he returned without incident (R. at 194-95).

On February 3, 1998, Plaintiff was transferred to a high intensity psychiatric unit because of ongoing suicidal ideation (R. at 186-92). On February 3, Plaintiff went to the nursing station in the domiciliary to receive his medications and poured the whole bottle of trazodone into his cup stating "I probably should take this whole bottle!" (R. at 192). The nurse grabbed the cup and gave Plaintiff his one prescribed pill, to which the Plaintiff replied that everything was screwed up. Id. Plaintiff was placed under supervision in the psychiatry unit that night and given Lorazepam the next morning for his nervousness (R. at 187). Plaintiff remained in the

---

[17] Prozac is a preparation of fluoxetine hydrochloride and is indicated for use in the treatment of depression. Physicians' Desk Reference, supra note 7, 943-44.

psychiatric unit until February 13, 1998 (R. at 166-80). He was monitored daily by psychiatric nurses, who noted that Plaintiff had limited social interaction with his peers, but interacted appropriately with the staff (R. at 163-65, 173-86). They also noted that Plaintiff remained depressed and had some disturbed sleep, but also had days where he felt less depressed (R. at 164, 173, 175, 180).

On February 4, 1998, Dr. Patricia Harrison performed a psychiatric evaluation of Plaintiff (R at 186-87).[18] She noted several recent stressors that exacerbated Plaintiff's depression including, being denied Social Security benefits, his recent relapse while on a pass to see his son, and having a friend taken to jail (R. at 186). Plaintiff reported that his medications made him feel a bit better but he still had little or no control over his impulses to drink. Id. Dr. Harrison observed that Plaintiff was poorly groomed, his affect was angry and depressed, he was mildly paranoid but without overt delusions, and he still had suicidal ideation (R. at 187). She diagnosed Plaintiff with major depression, dysthemia, and alcohol dependence and assigned him a GAF score of 40. Id. Dr. Harrison ordered his Prozac and trazodone prescriptions continued and added Wellbutrin[19] to stabilize his mood. Id. Dr. Harrison started Plaintiff on naltrexone[20] on February 10, 1998, but discontinued the medication when Plaintiff developed a palmer rash (R. at 167).

After Plaintiff returned to the domiciliary from the high intensity psychiatric unit, he disagreed with staff members because he was not given permission to leave the facility to attend AA meetings and other activities in the community (R. at 162-63). Eventually, Plaintiff's psychiatrist granted Plaintiff permission to leave the domiciliary for AA meetings and church, but

---

[18] The record indicates that Patricia Harrison is a physician, but it is not clear whether she is a psychiatrist or has any other specialty (R. at 181).

[19] Wellbutrin is a preparation of bupropion hydrochloride, which is indicated for the treatment of depression, but may cause generalized seizures. Physicians' Desk Reference, supra note 7, at 842.

[20] Naltrexone is an opioid antagonist, which is indicated for use to provide a blockade against the pharmacological effects of opioids to maintain an opioid free state in previously detoxified individuals. Id. at 956.

requested that he be accompanied. Id. On February 13, 1998, the Canandaigua VAMC MICA program agreed to admit Plaintiff beginning February 19, 1998, for a period of thirty days or less, after which he would return to the Bath VAMC (R. at 163).

On February 13, 1998, Dr. Harrison completed a discharge summary for Plaintiff (R. at 166-68). Dr. Harrison noted that Plaintiff was very dysphoric upon admission but that he began to feel more optimistic after a few days (R. at 167). She noted that Plaintiff's suicidal ideation had decreased and he was more enthusiastic about returning to the domiciliary and then the MICA program. Id. Dr. Harrison ordered Plaintiff to continue prescriptions on Wellbutrin, Prozac, Benadryl, and vitamins (R. at 167-68). Upon discharge, Dr. Harrison diagnosed Plaintiff with major depression, dysthemia, and alcohol dependence, noted that Plaintiff had chronic severe stressors, and assigned Plaintiff a GAF score of 65 (R. at 166).[21]

On February 19, 1998, Plaintiff was admitted to the Canandaigua VAMC MICA program (R. at 159). Hedy Tasbas, M.D. examined Plaintiff upon admission.[22] Id. Plaintiff reported that he had been depressed all his life, and that depression became more intense in 1991 when he began abusing alcohol and cocaine again. Id. Dr. Tasbas noted that Plaintiff's current combination of medications, Prozac, Wellbutrin, and trazodone, seemed to be alleviating his depression. Id. Upon admission, Plaintiff was diagnosed with alcoholism, cocaine dependence, and depression (R. at 156).

Clinical psychologist, Thomas Kwasnik, Ph.D., performed a psychiatric assessment of Plaintiff on February 23, 1998, and observed that Plaintiff was well-groomed, his affect was flat and his mood mildly depressed (R. at 154). Plaintiff reported his treatment at Bath VAMC domiciliary, stating that he had progressed satisfactorily until he became quite depressed and had a relapse in January while out on a pass. Id. Dr. Kwasnik diagnosed Plaintiff with mixed

---

[21] A GAF score of 61 to 70 indicates an individual has "mild symptoms . . . OR some difficulty in social, occupational, or school functioning, but [is] generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR, supra note 12, at 34.
[22] No specialty is noted for Dr. Tasbas.

substance dependence and major depression, assigning him a GAF of 45/60. Id. While in the

Canandaigua MICA program, Plaintiff participated in therapy for depression, anger and stress

management, and educational programs on relationships, spirituality, nutrition and addiction

recovery, as well as treatment for physical complaints (R. at 135-36, 140-51). Plaintiff's

treatment team helped him apply for assisted living at Lakeview following his discharge (R. at

135).  In an assessment dated March 16, 1998, Chong Kim, M.D., diagnosed Plaintiff with

alcohol dependence, cocaine dependence, nicotine dependence, and major depression,

assigning him a GAF of 45/60 (R. at 139).[23] On March 17, 1998, Plaintiff left on a special

overnight pass to secure his car and belongings from Bath, and upon his return his breathalyzer

test was positive, but below the 0.08 limit. Id. Because of Plaintiff's non-compliance with the

substance abuse programming, Plaintiff was irregularly discharged. Id. In a discharge summary

dictated by Jodi E. Fires, LPN, and approved by Joung S. Hong, M.D., dated March 18, 1998,

Plaintiff was diagnosed with "mixed substance dependence" and "organic affective disorder due

to poly substance" (R. at 137).[24] Plaintiff was assigned a GAF of 45/60. Id. The discharge

summary indicated Plaintiff had fair participation in his treatment and was able to verbalize

coping skills, but did not attempt to use them (R. at 139). Finally, it was noted that Plaintiff was

discharged without an aftercare plan or medications in place, but that before discharge he had

been taking bupropion, fluoxetine, multi-vitamins, thiamine, and trazodone. Id.

    On April 9, 1998, Dr. Hong saw Plaintiff in Canandaigua and completed an outpatient

progress note (R. at 416, repeated at 403-04). Plaintiff reported drinking six to twelve beers

every day which helped him to sleep. Id. Plaintiff requested his medications, which he had not

taken since he was discharged in March 1998. Id. Dr. Hong noted no evidence of psychosis or

dangerous behavior at that time. Id. Dr. Hong listed Plaintiff's diagnosis as "mixed substance

dependence, mostly alcohol and cocaine, nicotine, organic affective disorder due to

---

[23] The record does not indicate any specialty for Dr. Kim.
[24] The record does not indicate whether Dr. Hong has a specialty.

polysubstance." Id. Dr. Hong indicated he would refer Plaintiff to substance abuse care. Id.

On April 13, 1998, Dr. Chong Kim examined Plaintiff at a scheduled outpatient meeting (R. at 417, repeated at 403). Plaintiff reported that he was homeless and had been living at the Miami Hotel. Id. He reported drinking six to twenty-four beers daily. Id. Plaintiff stated that he wanted to stop drinking, but that he needed professional help. Id. Dr. Kim advised Plaintiff to enter detoxification, but Plaintiff wanted two days to arrange his affairs before admission. Id. The record does not indicate that Plaintiff was admitted for detoxification.

On July 17, 1998, Plaintiff met with Katherine Schaffer, a social worker who assisted him in recovering monies withheld from him by the Boston VAMC (R. at 418-19, repeated at 403).

### 4.    Dr. Lajewski 1998 or 1999

At his hearing in October of 2002 Plaintiff testified that he was treated by a private psychiatrist, Dr. Lajewski, in Farmington for approximately one year in 1998 or 1999; however, medical records from this psychiatrist are not in the administrative record (R. at 566-67). At the same hearing, Plaintiff's attorney stated that his staff was unable to locate Dr. Lajewski, to which the ALJ responded that the attorney should check the address with the Plaintiff (R. at 567). Plaintiff's attorney then stated that his staff had been looking for a Dr. Lajewski in Farmingdale, NY, and not Farmington, NY. Id. The record does not contain any other information about Plaintiff's treatment from Dr. Lajewski.

### 5.    Four Winds--Katonah 2000

On September 25, 2000, Plaintiff was referred to Four Winds—Katonah for inpatient care to treat his depression, suicidal ideation, and substance abuse, but was ultimately treated on an outpatient basis (R. at 461-65). At his admission examination, Plaintiff reported decreased appetite and sleep, depressed mood, anhedonia, suicidal ideation with several plans, and a substance abuse problem (R. at 462). Plaintiff reported bingeing on alcohol and occasionally

15

using cocaine to the "point of oblivion" in the hopes that it would "stop [his] heart." Id. Plaintiff

also reported paranoid ideation, thinking there may be a conspiracy against him. Id. Specifically,

Plaintiff reported that an employment background check showed alleged warrants out for his

arrest, but Plaintiff asserted that none existed. Id. Prior to admission, Plaintiff had attended a

MICA program at St. Mary's Hospital, which referred him to Four Winds—Katonah. Id. Plaintiff

was observed as having an anxious and depressed appearance, tense behavior, emotional

speech, depressed and anxious mood, constricted affect, no hallucinations, a distractible

thought process, and suicidal ideations (R. at 463-64). Plaintiff was diagnosed with major

depressive disorder recurrent and polysubstance dependency and assigned a current GAF

score of 26 and a GAF score of 50 for the past year (R. at 464).[25] Plaintiff's current medications

are listed as: depakote,[26] Seroquel,[27] Wellbutrin, trazodone, and Revia[28] (R. at 465). Plaintiff's

treatment plan included pharmacotherapy, individual, group and milieu therapy, as well as

therapeutic activities, substance abuse counseling, and 12-step meetings. Id.

      On October 10, 2000, Plaintiff was discharged from Four Winds—Katonah (R. at 466-

68). His primary therapist, Ginny W., ACSW, noted that he was being referred to an inpatient

program at a partner facility, Four Winds—Saratoga, because the local inpatient program felt he

needed more intensive care than they could provide (R. at 467).[29] Plaintiff had an admissions

appointment for October 11, 2000 (R. at 468). There are no records from Four Winds—

Saratoga.

---

[25] A GAF score of 21 to 30 indicates "behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas." DSM-IV-TR, supra note 12, at 34.
[26] Depakote is a preparation of divalproex sodium, which is indicated for treatment of seizures. Physicians' Desk Reference, supra note 7, at 514.
[27] Seroquel is a preparation of quetiapine fumarate, which is indicated for treatment of depressive episodes and acute manic episodes associated with bipolar disorder and bipolar maintenance. RxList, http://www.rxlist.com/seroquel-drug.htm (last visited Jan. 9, 2009).
[28] Revia is a preparation of naltrexone. RxList, http://www.rxlist.com/revia-drug.htm (last visited Jan. 9, 2009).
[29] This certified social worker's last name is illegible in the record (R. at 467-68).

16

6.     St. Peter's Addiction Rehabilitation Center ("SPARC") 2001

On October 24, 2001 Plaintiff was admitted to SPARC for alcohol detoxification (R. at 469-511). Jose M. David, M.D., gave Plaintiff the following diagnoses: principal diagnosis of acute alcoholic intoxication in alcoholism, continuous use; and secondary diagnoses of major depressive disorder recurrent episode moderate, alcohol withdrawal, cocaine abuse episodic use, attention deficit disorder with hyperactivity, social phobia, prolonged posttraumatic stress disorder, and tobacco use disorder. Id. Upon admission, Plaintiff reported drinking one case of beer daily since June of 2001 and using crack cocaine weekly, when available (R. at 475, 492, 500). Dr. David reported Plaintiff's psychiatric history as significant for major depression, post traumatic stress disorder, and paranoia (R. at 475). Plaintiff reported suicidal ideation the day before when he placed a knife to his throat and contemplated suicide. Id. Plaintiff reported that he was treated psychiatrically at Four Winds in January of 2001, but had not been taking his medications since that time. Id. On observation, Plaintiff was intoxicated and depressed. Id. Plaintiff appeared anxious and disheveled, but his physical examination was otherwise normal (R. at 476). The treatment plan for Plaintiff included detoxification, substance abuse treatment in aftercare, observation due to suicide plan, and psychiatric consult to review Plaintiff's need to restart medication. Id.

In a psychosocial history taken on October 25, 2001, Plaintiff reported that his alcohol use was totally unmanageable (R. at 491). It was noted that Plaintiff was living in a non-sober rooming house, which was not a safe environment (R. at 491-92). Plaintiff was observed as adequately groomed, with good hygiene and normal eye contact (R. at 492). Plaintiff was observed as calm, with a broad affect and euthymic mood, and no hallucinations. Id. Plaintiff was seen by Dr. Holt for a psychiatric evaluation, but those records are not included (R. at 493). Plaintiff was diagnosed with alcohol and cocaine dependence and advised to complete inpatient

rehabilitation (R. at 494).[30] During his stay at St. Peter's, Plaintiff was monitored and treated for

withdrawal symptoms (R. at 480-87, 495, 497-99, 504-05).

Plaintiff was discharged on October 29, 2001, and provided a ride to SPARC Guilderland

for rehabilitation beginning the same day (R. at 506). There are no records from SPARC

Guilderland. Upon discharge from SPARC's detoxification unit, Plaintiff was taking Wellbutrin

and trazodone. Id.

### 7.      VAMC 2001-2002

On November 7, 2001, Plaintiff contacted the VA seeking housing assistance as he was

being discharged from SPARC Guilderland (R. at 420). A VA note from November 15, 2001,

indicates that VA staff members were attempting to reach Plaintiff by phone to admit him into a

six-week intensive day program (R. at 421).

On December 12, 2001, Plaintiff walked into the Albany VAMC requesting to transfer his

mental health treatment from a private facility in Latham (R. at 423-24). He reported attending

an intensive MICA day program in Latham five days a week, which would soon be finished. Id.

William F. Cox, M.D., conferred with Plaintiff on December 12, 2001, to assess him for

medication refills at the VAMC (R. at 424).[31] Dr. Cox observed that Plaintiff was cooperative

overall but curt on one occasion when defending his "extensive medication regime." Id. Dr.

Cox's diagnostic impression was polysubstance dependence. Id. Dr. Cox noted Plaintiff's

stressors were severe and assigned him a GAF score of 51.[32] Id. Dr. Cox agreed to continue

Plaintiff's medications but advised him that "probably the major reason why he is doing better"

was his participation in a structured treatment program and his sobriety. Id. Dr. Cox also noted

that Plaintiff's records from his six-year period of sobriety contradicted Plaintiff's story that he

---

[30] The name and qualifications of the clinician completing this psychosocial history are unclear (R. at 494).

[31] The record does not indicate whether Dr. Cox has a specialty.

[32] A GAF of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty on social, occupational, or school functioning." DSM-IV-TR, supra note 12, at 34.

was "very depressed" during that time. Id. No records from that time period are included. Dr. Cox further noted that "an independent mood disturbance is difficult to identify in the early stages of sobriety." Id. Dr. Cox questioned Plaintiff's prescriptions for trazodone, gabapentin,[33] and bupropion,[34] the last of which Dr. Cox felt may be causing Plaintiff's high anxiety. Id. Dr. Cox referred Plaintiff to the mental health clinic for medication management, and advised him to continue residential recovery indefinitely, with relapse prevention activities. Id.

On December 20, 2001, Plaintiff was seen at the Albany VAMC Mental Health Clinic by psychiatrist Petra Langner, and psychiatry resident Anna Schroder (R. at 426). Plaintiff reported he was "doing well" and that his current medications were "the best he has had" but he did report waking up after only five or six hours of sleep. Id. Dr. Langner diagnosed Plaintiff with depression and polysubstance dependence. Id. She noted that Plaintiff's gabapentin and bupropion prescriptions were off-label, but that she had success with their use in the past and increased Plaintiff's gabapentin and continued his bupropion after discussing the risks with Plaintiff. Id. Dr. Langner also continued Plaintiff's naltrexone, and Seroquel, but noted the Seroquel could be discontinued in the future. Id. Dr. Langner arranged for Plaintiff to see Dr. Chris Marra in the future, but she continued to review Plaintiff's treatment. Id.

On January 28, 2002, Plaintiff was seen by psychiatry resident, Chris Marra, D.O. (R. at 427, 455). Plaintiff denied current depressive or anxiety symptoms, or substance abuse (R. at 427). Dr. Marra noted that Plaintiff's mood was "good" and his affect euthymic and appropriate. Id. He noted that Plaintiff had a "resolution" of depression and anxiety symptoms on his present medications. Id. Dr. Marra questioned whether Plaintiff's original symptoms were substance induced and listed Plaintiff's diagnoses as: depressive disorder not otherwise specified,

---

[33] Gabapentin is indicated for the treatment of post herpetic neuralgia, a complication associated with shingles, or as an adjunctive therapy for seizures. RxList, http://www.rxlist.com/neurontin-drug.htm (last visited Jan. 9, 2009).
[34] Bupropion is the generic term for the trademark preparation known as Wellbutrin, which is indicated for treatment of depression but may cause seizures. Physician's Desk Reference, supra note 7, at 842.

polysubstance dependence (alcohol, cocaine, opioids), and rule out substance induced mood disorder. Id. Dr. Marra and Plaintiff decided to gradually decrease some of Plaintiff's medications at the next visit and Plaintiff wished to discuss some child abuse issues. Id. At this visit, Plaintiff discontinued naltrexone, but continued Wellbutrin, gabapentin, quetiapine, and addiction groups three times a week. Id. Dr. Langner reviewed the plan and approved. Id.

On February 22, 2002, Plaintiff met with Dr. Marra and reported a major stressor of recently being forced to move from his housing in Delmar to a house on Dana Street (R. at 428). Plaintiff reported some paranoid ideation, feeling that his housemates were "screwing" with his food and taking his car when he was at work, and feeling that others were watching him at the gym. Id. Plaintiff also reported having drug cravings and being "on edge." Id. Dr. Marra observed Plaintiff's mood as difficult and his affect constricted and irritable. Id. Dr. Marra noted that Plaintiff did not meet the criteria for hypomania, but was on a superclinical dose of Wellbutrin with an "unknown history of Bipolar disorder." Id. Dr. Marra indicated that Plaintiff's irritability and paranoia could be treated by increasing his quetiapine. Id. Plaintiff's Wellbutrin and gabapentin were decreased, his quetiapine was increased, and he restarted naltrexone. Id. In addition to his previous diagnoses, Dr. Marra now also wanted to rule out psychosis not otherwise specified. Id.

At his March 1, 2002, visit with Dr. Marra, Plaintiff was expressing frustration, anger, and hopelessness, but had some improvement with his paranoid ideation on the increased quetiapine (R. at 431). Dr. Marra noted that Plaintiff had not used substances since October of 2001. Id. Dr. Marra observed a mild increase in Plaintiff's psychomotor activity, Plaintiff's mood was difficult, and his affect was constricted and irritable. Id. Dr. Marra stated that Plaintiff was having difficulty coping and maintained Plaintiff's medications at their previous dosages. Id. Dr. Marra eliminated the diagnosis of psychosis not otherwise specified, and diagnosed Plaintiff with depressive disorder not otherwise specified, polysubstance dependence (alcohol, cocaine,

20

opioids), and rule out substance induced mood disorder. Id.

On Plaintiff's March 8, 2002, visit with Dr. Marra, he reported improvement with paranoid ideation and drug cravings (R. at 433). Dr. Marra observed that Plaintiff's mood was okay and his affect euthymic and appropriate. Id. Dr. Marra continued Plaintiff's previous medication dosages. Id.

On March 15, 2002, Plaintiff described his recent stressors, including his father's illness (R. at 434). Dr. Marra observed that Plaintiff's mood was tired and his affect constricted and dysphoric. Id. He noted that Plaintiff's paranoid ideation and drug cravings continued to improve on his current medication and maintained their doses. Id.

On March 26, 2002, Plaintiff told Dr. Marra that, after his father died, he relapsed on alcohol for eight or nine days, drinking eighteen to twenty-four beers per day (R. at 435). Dr. Marra instructed Plaintiff to go directly to the emergency room for treatment of withdrawal symptoms. Id.

On April 3, 2002, Plaintiff returned to see Dr. Marra and reported dysphoria and frustration (R. at 436). Dr. Marra observed Plaintiff's mood was frustrated and his affect was constricted, dysphoric, and irritable. Id. Dr. Marra noted that Plaintiff was readjusting to his present situation and restarted Plaintiff on bupropion, and continued his gabapentin and quetiapine. Id.

At Plaintiff's April 12, 2002 visit with Dr. Marra, Plaintiff reported less dysphoria and frustration (R. at 437). Dr. Marra noted Plaintiff's mood was okay and his affect was mildly constricted and dysphoric. Id. Dr. Marra's diagnoses were: depressive disorder not otherwise specified, polysubstance dependence—in remission (alcohol, cocaine, opioids), and rule out substance induced mood disorder. Id. Dr. Marra ordered Plaintiff to continue his gabapentin, quetiapine, bupropion, and attend three group meetings a week and psychotherapy. Id.

At his April 26, 2002 meeting with Dr. Marra, Plaintiff reported increased dysphoria,

21

anger, and frustration with his present situation (R. at 438). Dr. Marra observed Plaintiff as
frustrated and his affect as constricted and dysphoric. Id. Dr. Marra noted that Plaintiff was
having increased difficulty adjusting to his present situation, but when Plaintiff originally came to
psychotherapy, he had a stable mood and appropriate anger management on his medications.
Id. Dr. Marra noted that Plaintiff's medications had been reduced since then to maximize the risk
to benefit ratio, but now increased Plaintiff's medications to their previous doses. Id. Dr. Mara
increased Plaintiff's bupropion, gabapentin, and continued quetiapine. Id.

On May 3, 2002, Plaintiff told Dr. Marra that he had been recently fired from his job "due
to confusion over schedule [sic]" (R. at 439). Dr. Marra noted Plaintiff had minimal dysphoria,
anger and frustration. Id. Plaintiff exhibited "over-valued ideation involving police officers," for
which Dr. Marra was considering an increase in quetiapine. Id. Plaintiff's mood was observed as
okay and his affect mildly constricted and depressed. Id.

At his May 17, 2002 visit with Dr. Marra, Plaintiff reported finishing a substance abuse
course that enabled the reinstatement of his driver's license (R. at 442). Plaintiff reported
difficulty finding employment and Dr. Marra noted that Plaintiff "had difficulty with interpersonal
relations due to his abrupt manner and poorly regulated emotions." Id. Dr. Marra now included
personality disorder not otherwise specified in his diagnoses. Id. Plaintiff's mood was observed
as okay and his affect as mildly constricted and depressed. Id.

On May 31, 2002, Plaintiff reported continued difficulty finding employment and Dr.
Marra again noted Plaintiff's interpersonal difficulties were due to his abrupt manner and poorly
regulated emotions (R. at 443). Dr. Marra observed Plaintiff's mood as frustrated and his affect
as mildly constricted and dysphoric. Id.

Plaintiff began applying for the CWT, a vocational program, which required a physical
examination and an addiction screening interview (R. at 440, 444-50). On May 8, 2002, Plaintiff
was seen by Cherilyn Rubin, RN, for a physical (R. at 440). Nurse Rubin noted that there were

22

no apparent medical problems that prevented Plaintiff from participating in the program. Id. On June 4, 2002, Plaintiff went through a substance abuse screening interview, and was assigned to the relapse prevention track (R. at 444-50). On June 26, 2002, and July 24, 2002, an addiction therapist, Scott Bradley, recorded his attempts to reach Plaintiff by phone and mail, and then closed Plaintiff's case with addiction services (R. at 452-53).

On June 14, 2002, Plaintiff reported to Dr. Marra continued significant improvement with his anger and dysphoria (R. at 451). Plaintiff complained that he was still unable to find employment, which was a major stressor. Id. Dr. Marra stated, "[p]ersonality is a central factor leading to continued interpersonal difficulties." Id. At this point, Dr. Marra ruled out substance induced mood disorder, and diagnosed Plaintiff with: depressive disorder not otherwise specified, polysubstance dependence—in remission (alcohol, cocaine, opioids), and personality disorder not otherwise specified. Id. Dr. Marra noted that Plaintiff's next appointment would be scheduled with a new Doctor. Id.

On October 7, 2002, Plaintiff met with psychiatry resident, Ginger Simor, whose work was reviewed and approved by Dr. Sumner Goodman, staff psychiatrist (R. at 454-55). Plaintiff told Dr. Simor that his problem was "difficulty communicating with people" because he "rub[s] them the wrong way" and "gets into frequent arguments" (R. at 455). Plaintiff reported that he felt safer going to work, the store, and then home to avoid confrontations. Id. Plaintiff reported feeling "a little down his whole life" and feeling worse when abusing substances. Id. He admitted to drinking alcohol every few days since July 2002, when he stopped taking his psychiatric medications. Id. Dr. Simor noted that Plaintiff exhibited mild paranoia regarding not trusting the government and thinking they might be watching him. Id. Dr. Simor also noted Plaintiff had "possible ideas of reference" in that Plaintiff described a woman parking her car perpendicular to his and Plaintiff wondered if she were taking notes about him for the government, but he was not convinced. Id. Dr. Simor diagnosed Plaintiff with: depressive disorder not otherwise

23

specified, alcohol dependence, polysubstance dependence in remission (coke, heroin, opioids),

rule out substance induced mood disorder, and rule out organic mood disorder. Id. Dr. Simor

also noted that Plaintiff had antisocial and borderline traits and assigned him a GAF score of 55.

Id. Dr. Simor referred Plaintiff to the CDRP and AA meetings before restarting Plaintiff's

medications. Id. Plaintiff's VA medical records were printed on October 15, 2002, thus his next

session, scheduled for October 16, 2002, is not included. Id.

### B.    Consultative Examiners

#### 1.    John J. Seltenreich, Ph.D.

On September 5, 1997, at the request of the State agency, John J. Seltenreich, Ph.D.

performed a psychiatric evaluation of Plaintiff (R. at 98-101). Dr. Seltenreich diagnosed Plaintiff

with alcohol and cocaine dependence, heroin dependence in sustained remission, major

depression, post-traumatic stress disorder, and borderline personality disorder (R. at 100). Dr.

Seltenreich assigned Plaintiff a GAF score of 30. Id. Dr. Seltenreich opined:

> [Plaintiff] appears to have a variety of psychiatric disturbances which exist
> independent of his substance use disorders. He reports not improving much
> while remaining clean and sober in the past and eventually relapsing due to his
> mental health difficulties. He would benefit from receiving some cognitive
> behavioral treatment for his anxiety and mood disturbances and may also benefit
> from being in a group specifically designed for people with borderline personality
> disorders. His prognosis is quite guarded, however, due to his multiple relapses
> in the past.

(R. at 100-101).

#### 2.    James Thalmann, Ph.D.

On November 7, 1997, at the request of the State agency, James Thalmann, Ph.D.

conducted a psychiatric evaluation of Plaintiff (R. at 113-15). Dr. Thalmann noted Plaintiff's

affect as irritable and mood depressed (R. at 144). Dr. Thalmann observed Plaintiff's "thought

content was perseverative [sic] of angry themes."[35] Id. Dr. Thalmann stated Plaintiff "suffers

---

[35] It appears that the doctor meant that Plaintiff exhibited perseverative behavior with angry themes.

from significant depression which is comorbid with impairment of alcohol and substances" and Plaintiff "has had auditory perceptual disturbances of illusory nature." Id. Dr. Thalmann found Plaintiff's insight and judgment to be poor and his frustration tolerance limited. Id. Dr. Thalmann diagnosed Plaintiff with major depression recurrent, alcohol abuse in early remission, opioid abuse in early stage remission, cocaine abuse in early stage remission, and rule out avoidant personality disorder (R. at 114-15). He assigned Plaintiff a GAF score of 50 (R. at 115). Dr. Thalmann concluded that Plaintiff was functioning at a low level with a "downward drift" and was impaired with both substance abuse and an affective disorder. Id. He gave Plaintiff a "quite limited prognosis at this time for capacity to work." Id.

### C.   Residual Functional Capacity ("RFC") Analyses

#### 1.   Disability Analyst, Ms. Weingartner

On September 15, 1997, disability analyst Ms. Weingartner completed a psychiatric review technique (R. at 102-10). Ms. Weingartner found that Plaintiff met parts A and B of Listing 12.04 (R. at 102). She concluded that Plaintiff had a disturbance of mood evidenced by anhedonia, sleep disturbance, psychomotor agitation, and feelings of guilt or worthlessness (R. at 105). Ms. Weingartner concluded that Plaintiff had slight limitations in his activities of daily living, marked difficulties maintaining social functioning, seldom had difficulties maintaining concentration or pace, and had repeated (three or more) episodes of decompensation (R. at 109).

#### 2.   Unidentified State Medical Consultant, M.D.

In October of 1997 a Medical Consultant ("MC") reviewed Ms. Weingartner's findings and disagreed with each of them (R. at 111).[36] The MC noted that there was extensive evidence of substance addiction disorders, which had not been assessed (R. at 112). The MC also noted

---

[36] While the MC is evidently a Doctor, as "M.D." appears after the signature, the signature and portions of the MC's reasoning are is illegible, thus the Doctor's name is excluded and only the legible reasoning is included.

that medical evidence since 1993 was sparse and equivocal. Id. The MC further noted that Dr. Seltenreich's September 1997 assessment had minimal observed or recorded objective findings. Id. The MC recommended that the State agency contact Plaintiff's group home for more medical evidence and information of Plaintiff's activities of daily living. Id.

### 3. State Agency Doctor, James Alpert, M.D.

On December 23, 1997, James Alpert, M.D., advised Analyst Weingartner to seek out evidence of Plaintiff's activities of daily living from two sources and to seek a report from Plaintiff's treating psychiatrist as to his depression and substance abuse (R. at 116).

On January 29, 1998, Dr. Alpert completed a psychiatric review technique for the State agency (R. at 113-26). Dr. Alpert concluded that Plaintiff had a depressive disorder NOS (not otherwise specified) (R. at 121) and a polysubstance abuse addiction disorder in early full remission (R. at 124). Dr. Alpert determined that Plaintiff had slight limitations in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence or pace (R at 125). He further found that there was insufficient evidence to determine whether Plaintiff had episodes of decompensation. Id.

On January 29, 1998, Dr. Alpert completed a mental RFC assessment (R. at 127-30). Dr. Alpert found Plaintiff not significantly limited in all categories except for the ability to set realistic goals or make plans independently of others, where he found Plaintiff moderately limited (R. at 127-28). Dr. Alpert concludes that Plaintiff was interacting with others in the Veteran's Affairs dormitory (R. at 129).[37] Dr. Alpert notes that Plaintiff was sober from 1985 to 1991 and that Plaintiff worked from 1991 to 1994 as a computer systems analyst apparently while using substances. Id. He noted that Plaintiff had plans for the future and reasoned that Plaintiff was "clearly not someone experiencing hopelessness." Id. Dr. Alpert stated that Plaintiff

---

[37] Dr. Alpert's reasoning is only somewhat legible. The readable portions are described here.

does not exhibit the requisite symptoms for major depressive disorder, but that he could qualify for depressive disorder not otherwise specified. Id. Finally, Dr. Alpert concluded Plaintiff could carry out work procedures, could sustain his concentration, could relate appropriately to others, and could sustain a normal work week with a consistent pace. Id.

### 4.  VA Treating Psychiatrist Dr. Sumner Goodman

On October 29, 2002, Dr. Sumner Goodman, Plaintiff's psychiatrist at the VA, faxed to Plaintiff's attorney a Medical Assessment of Ability to do Work Related Activities (Mental) (R. at 521, 511-12).[38] Dr. Goodman indicated that Plaintiff's abilities to make occupational adjustments, such as the abilities to relate to co-workers or interact with a supervisor, were all rated poor to none (R. at 511). Dr. Goodman indicated that Plaintiff's abilities to make performance adjustments, such as understanding, remembering and carrying complex or simple job instructions, were poor to none (R. at 512). Dr. Goodman indicated that Plaintiff had a fair ability to maintain his personal appearance, but that his other abilities in making personal or social adjustments, such as behaving in an emotionally stable manner or relating predictably in social situations, were poor to none. Id. Dr. Goodman also indicated that Plaintiff could not manage his benefits in his own best interest. Id. In support of his assessments, Dr. Goodman stated that Plaintiff had "multiple psychiatric hospitalizations since 1995, complicated by alcohol and polysubstance abuse. [Patient] remains depressed and dysfunctional in social situations. Paranoid, [with] referential thinking. Medication non compliant" (R. at 511).

### D.  Medical Expert, Dr. Ralph Sibley's Testimony

By order of the Appeals Council on remand, the ALJ called psychologist, Dr. Ralph F. Sibley, to testify at Plaintiff's hearing as a medical expert (R. at 346, 357, 365-67, 568-83). Dr. Sibley reviewed Plaintiff's medical records, heard Plaintiff's testimony, and asked Plaintiff

---

[38] Although Dr. Goodman's Medical Assessment is not dated, Plaintiff's attorney stated at the October 30, 2002 hearing that it was faxed by Dr. Goodman on October 29, 2002 (R. at 521).

questions at the hearing (R. at 521, 525-27, 568-78).[39] Dr. Sibley testified that Plaintiff had

medically determinable impairments, "[s]tarting with depression, rated under listing 12.04, A1

and A[,] C, E, F and G. 12.08, which is personality disorder, A2. [s]uspiciousness and hostility[,]

and substance abuse disorder, 12.09, which has to be rated under on of those other disorders"

(R. at 578). When asked if Plaintiff's impairments met those listings, Dr. Sibley replied, "I think

the combination of those impairments has, you know, does meet the standards under 12.09." Id.

"When asked the basis for his opinion, Dr. Sibley replied that he noticed that Plaintiff was

obviously motivated to work, and had extensive treatment and repeatedly tried to work despite

continuing frustrations (R. at 578-79). Dr. Sibley stated that Plaintiff was not someone who

made up problems to receive benefits, but someone who wanted to work, had repeatedly tried

to work, and failed (R. at 579). Dr. Sibley opined that Plaintiff's impairments began in October of

1995 and continued since then continuously, although he noted that he lacked records for 1999

(R. at 579-80). Dr. Sibley testified that Plaintiff's impairments limited his ability to sustain

employment because Plaintiff "needs psychiatric medication to function on a continuing basis

well enough to remain employed" (R. at 580). Dr. Sibley continued, saying that with Plaintiff's

combination of substance abuse and mental impairments it is typical for a person to relapse on

the substance of choice, neglect to take medications, and decompensate to the point that they

are unable to function normally. Id.

Dr. Sibley also testified regarding Plaintiff's drug and alcohol abuse. The ALJ described

Public Law 104-121, by saying:

> If a person is determined to have a drug or an alcohol addiction problem which is
> primary and material that they may be disabled but will not be awarded benefits.
> But however, if they can be found disabled for reasons independent of addictions
> such that the addiction is not primary and material, then notwithstanding the
> addiction they could be found disabled on an independent impairment.

---

[39] The Court notes that both the ALJ and Dr. Sibley were presented with a substantial amount of Plaintiff's
medical records on the day of the 2002 hearing, such that the ALJ postponed the hearing to allow
themselves time to review the material (R. at 521-27).

Id. The ALJ then asked Dr. Sibley if drug and alcohol addiction was material, to which Dr. Sibley replied, "I believe that it is, Your Honor" (R. at 581). To support his answer, Dr. Sibley quoted Dr. Cox, who had written that during Plaintiff's six year period of sobriety, from 1985 through 1991, his VA medical records contradicted Plaintiff's contention that he experienced depression.[40] Id. Dr. Sibley quoted Dr. Cox again, stating "independent mood disturbance is difficult to identify in the early stages of sobriety." Id. The ALJ then asked Dr. Sibley whether Plaintiff's depression and personality disorder could be "treated and resolved or at least ameliorated without first resolving the drug and alcohol addiction problems?" Id. When Dr. Sibley replied "no," the ALJ asked, "So you have to resolve the addiction problems before you can go ahead and address the other mental impairments?" Id. Dr. Sibley replied in the affirmative (R. at 582). The ALJ asked whether, absent Plaintiff's addictions, his other impairments were severe enough to prevent him from working. Id. Dr. Sibley's testimony continued:

> A   I find it impossible to answer that, Your Honor, because of the way that we usually assess that is to see how the patient functions during the period of abstinence from mood altering substances. And there has, you know, from the records I was given, there were no periods of extensive sobriety sufficient to make a judgment on that. Could I qualify my earlier statement—
> Q   Sure.
> A   —in terms of, you know whether the addiction has to be the primary focus of treatment. I do believe, certainly, what I said, but it is certainly possible to treat both problems simultaneously, particularly if someone like Mr. O'Connell who has severe depression, that can be treated with medication while the addiction problem is being addressed.

Id. Under questioning by Plaintiff's attorney, Dr. Sibley affirmed that it was his testimony that he "simply cannot render an opinion as to whether or not Mr. O'Connell would be unable to work or if he could abstain from alcohol and drugs" (R. at 583). Dr. Sibley agreed with Plaintiff's attorney that "it was impossible to separate out the two without having a period where [Plaintiff was] not

---

[40] Dr. Cox saw Plaintiff on December 12, 2001 (R. at 424). See supra, Section 7 "VAMC 2001-2002." As Dr. Sibley noted, records during Plaintiff's six years of sobriety, from 1985 through 1991, are not included in the administrative record, as they are prior to Plaintiff's alleged date of onset (R. at 581).

using drugs and alcohol so that we can observe him." Id.

## Discussion

### A.  Legal Standard and Scope of Review

8.  A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383 (c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); see Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).   "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

9.  "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F.

Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's

determination considerable deference, and may not substitute "its own judgment for that of the

[Commissioner], even if it might justifiably have reached a different result upon a *de novo*

review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

10.   The Commissioner has established a five-step sequential evaluation process to

determine whether an individual is disabled as defined under the Social Security Act. See 20

C.F.R. §§ 416.920, 404.1520. The United States Supreme Court recognized the validity of this

analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987), and it remains the proper

approach for analyzing whether a claimant is disabled.

11.   This five-step process is detailed below:

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the [Commissioner] next
> considers whether the claimant has a "severe impairment" which significantly
> limits his physical or mental ability to do basic work activities. If the claimant has
> such an impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in Appendix 1 of the
> regulations. If the claimant has such an impairment, the [Commissioner] will
> consider him disabled without considering vocational factors such as age,
> education, and work experience; the [Commissioner] presumes that a claimant
> who is afflicted with a "listed" impairment is unable to perform substantial gainful
> activity. Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, he has the residual
> functional capacity to perform his past work. Finally, if the claimant is unable to
> perform his past work, the [Commissioner] then determines whether there is
> other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan,

168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. §§ 416.920, 404.1520.

12.   While the claimant has the burden of proof as to the first four steps, the

Commissioner has the burden of proof on the fifth and final step. See Bowen, 482 U.S. at 146

n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984). The final step of this inquiry is, in turn,

divided into two parts. First, the Commissioner must assess the claimant's job qualifications by

considering his physical ability, age, education, and work experience. Second, the

Commissioner must determine whether jobs exist in the national economy that a person having

the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§

416.920(g); 404.1520(g); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

13.   In this case, the ALJ made the following findings with regard to factual information

as well as the five-step process set forth above:

> 1.   The claimant has met the disability insured status requirements as of the alleged onset date of October 31, 1996 and continues to meet them through the date of this decision.
> 2.   The claimant presumably has the ability to engage in substantial gainful activity since his alleged onset date of October 31, 1996 when not using alcoholic substances. Although this claim could be denied at step one of the sequential evaluation because of substantial gainful activity, the medical aspects of this claim will be considered to determine if medically, the claimant is capable of sustaining physical activity at the level described. Therefore, this decision will proceed to the other steps of the sequential evaluation.
> 3.   The claimant has substance induced mood disorder with only mild depression when sober. His impairments may meet section 12.04 of the Listing of Impairments, but he cannot be found disabled or receive benefits because his alcoholism is primary and material to the issue of disability within the meaning of PL 104-121.
> 4.   The claimant's allegations are not entirely credible or fully supported by the objective medical evidence of record.
> 5.   The claimant has an unlimited exertional residual functional capacity. The evidence does not establish any limitations in the claimant's ability to perform work-related activities such as lifting, carrying, standing, walking, sitting, or pushing/pulling. The claimant's non-exertional impairment is mild depression. Absent his alcoholism, he does not have any significant limitations that would restrict him from performing basic work activities, including performing his past relevant work as a technical writer, computer system operator or analyst.
> 6.   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(R. at 340-41).

### B.  Plaintiff's Challenge

14.   Plaintiff argues generally that the ALJ's decision is not supported by substantial

evidence. Plaintiff's Brief, p. 4. Specifically, Plaintiff argues that (1) the record does not support

a denial of Plaintiff's claim at step one; (2) the ALJ did not apply or document the special

technique for evaluating Plaintiff's mental impairment; (3) the record establishes that Plaintiff's

depression is a severe impairment; (4) the ALJ improperly weighed the medical opinions and

substituted his own opinion for those of competent medical sources (5) the ALJ did not properly

assess the impact of Plaintiff's drug and alcohol use on his ability to work; and (6) the matter should be remanded solely for the calculation of benefits.

### 1. Plaintiff's First Allegation: The Record Does Not Support a Denial of Plaintiff's Claim at Step One.

15.  Plaintiff argues his work since 1996 was not substantial gainful activity because it qualified as a trial work period and several unsuccessful work attempts. Plaintiff's Brief, pp. 16-18. Defendant argues that Plaintiff's arguments are moot as the ALJ proceeded past step one in his analysis and ultimately found Plaintiff not disabled due to his substance abuse. Defendant's Brief, p. 7 n.3. On this point, the Court agrees with the Defendant.

Here, the ALJ concluded, "[a]lthough the claimant can be denied benefits at step one, since this is a District Court remand, the Administrative Law Judge will also review and consider the medical aspects of this claim to as to [sic] whether medically and/or mentally, the claimant is capable of sustaining gainful activity and the relevance of PL. 104-121 thereto" (R. at 334). The ALJ then proceeded to assess further steps in the sequential evaluation (R. at 335-41). Because the ALJ did not deny Plaintiff's claim at step one, the argument that Plaintiff should not be denied at step one is moot.

### 2. Plaintiff's Second Allegation: The ALJ Improperly Omitted the Findings Required by the Special Technique when Evaluating a Mental Impairment.

16.  Plaintiff argues that the ALJ erred in not making any of the four required findings under a special technique, hereinafter described. Plaintiff's Brief, p. 27. Plaintiff further points out that even if the ALJ's error was only failing to document his findings, the Court must still remand because there is an unacceptable risk that the incorrect legal standards were used. Plaintiff's Brief, p. 26.

When evaluating the severity of mental impairments, the regulations require application of a "special technique" at the second and third steps, in addition to the sequential analysis.

Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520a). The

technique first requires a determination of whether the Plaintiff has a medically determinable

mental impairment. 20 C.F.R. § 404.1520a(b)(1). Then, the ALJ must rate the degree of

Plaintiff's functional limitation resulting from the impairment in four areas: (1) activities of daily

living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of

decompensation.[41] § 404.1520a(c)(3). A mental impairment is generally found not severe if the

degree of limitation in the first three areas is mild or better and there are no episodes of

decompensation. § 404.1520a(d)(1). The ALJ must document "a specific finding as to the

degree of limitation in each of the functional areas." § 404.1520a(e)(2). Until *Kohler*, the Second

Circuit had not determined the consequence of failing to adhere to the requirements of the

special technique.

　　　In *Kohler*, the Second Circuit found the failure to apply the special technique was legal

error. Kohler, 546 F.3d at 269. In that case, the ALJ did "not appear to have evaluated each of

the four functional areas, and did not record specific findings as to [the Plaintiff's] degree of

limitation in any of the areas." Id. at 267. Because the ALJ failed to "conduct a distinct analysis"

of the issue, "it [was] not clear [to the Court] whether the ALJ adequately considered the entire

record when determining the severity of [the Plaintiff's] impairment[.]" Id. at 267-68.

Nonetheless, the Court left open the possibility that, under different facts, an ALJ's failure to

apply the special technique would be harmless error. Id. at 269. The Court suggested, but did

not find, that, if an ALJ actually complied with the special technique by making determinations

regarding a Plaintiff's degree of limitation, then merely failing to strictly comply with the

documentation requirement would be harmless error. See Id. at 269 n.9. However, where the

---

[41] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." Kohler, 546 F.3d at 266 n.5 (quoting United States Social Security Administration, Disability Evaluation Under Social Security § 12.00 (June 2006)).

Court could not identify findings regarding Plaintiff's limitations in the functional areas, nor discern whether the ALJ considered all the evidence relevant to those areas, the Court could not say the decision reflected an application of the correct legal standard, and ordered remand for the ALJ to properly apply the special technique. Id. at 269.

In this case, the ALJ "reaffirm[ed]" and "incorporate[d] by reference" his "previous decision of September 11, 1998" (R. at 335). In his 1998 decision, the ALJ completed a psychiatric review technique form ("PRTF"), which at the time fulfilled the special technique requirement (R. at 22-24).[42] In the 1998 PRTF, the ALJ found that Plaintiff had a depressive disorder not otherwise specified and a substance addiction disorder (R. at 22-23). He found Plaintiff had only slight limitations in his activities of daily living, maintaining social functioning, and concentration, persistence or pace (R. at 23-24). The ALJ also found that Plaintiff had never had an episode of decompensation (R. at 24). In his 2003 decision, the ALJ neither considered the special technique nor made findings with regard to Plaintiff's limitations in the four functional areas. The absence of such findings in the 2003 decision is particularly striking in light of the additional medical evidence and testimony made available to the ALJ at the second hearing, including some evidence indicating greater than mild limitations in the first three functional areas and possible episodes of decompensation. See e.g., (R. at 442, 443, 451) (in 2002, Dr. Marra noted Plaintiff's difficulty interacting with others), (R. at 461-65) (in 2000 Plaintiff was admitted to a Four Winds hospital because he had contemplated suicide and upon examination he was assigned a GAF of 26 indicating serious impairment or an inability to function in most areas), (R. at 511-12) (in 2002 Dr. Goodman opined that Plaintiff had poor to no ability to adjust to almost every area of work life), (R. at 536, 540, 542) (Plaintiff testified to difficulty interacting with supervisors and co-workers and "always ha[ving] difficulty with people"), (R. at 542) (Plaintiff

---

[42] "Until 2000, the regulations also required the ALJ to complete a PRTF and attach it to his decision." Kohler, 546 F.3d, at 266 (citing Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50748 (Aug. 21, 2000)).

testified to his poor concentration). The ALJ's 2003 decision gives no indication that he

considered the additional evidence with respect to Plaintiff's degree of limitation in the functional

areas. Moreover, the Court notes that by order of the Appeals Council, Plaintiff was entitled to a

new hearing and a new decision, which the ALJ effectively denied Plaintiff when he incorporated

his previous decision and failed to provide any additional analysis on the issue. See (R. at 346)

(remand order directing the ALJ to provide a new hearing, develop the record, and "issue a new

decision"); see also Scott v. Barnhart, No. 07-CV-6561, 2009 WL 54502, at *10 (W.D.N.Y. 2009)

("[An] ALJ's failure to comply with the Appeals Council's order constitutes legal error, and

necessitates a remand."). This Court cannot say that the failure to discuss Plaintiff's functional

limitations in the four areas in his 2003 decision was harmless error because it is not clear that

the ALJ adequately considered all the evidence relevant to the issue, nor is it clear that the ALJ

applied the special technique in formulating his new decision. Therefore, the Court recommends

remand so that the ALJ may properly apply the special technique considering all the relevant

evidence.

### 3.  Plaintiff's Third Allegation: Substantial Evidence Establishes Plaintiff's Mental Impairment is Severe.

17.   Plaintiff first argues that the ALJ's decision was "tantamount" to finding the Plaintiff

did not have a severe mental impairment and then argues that such a finding is not supported

by substantial evidence. Plaintiff's Brief, pp. 4, 18-19. Defendant responds that the ALJ did in

fact find that Plaintiff had a severe mental impairment.[43] Defendant's Brief, p. 7. Thus, Plaintiff's

argument assumes the ALJ found no severe mental impairment, while Defendant's argument

assumes the ALJ found a severe mental impairment. The parties were forced to make these

assumptions because the ALJ did not clearly determine whether Plaintiff had a severe

---

[43] The Court notes that Defendant's argument, that the ALJ made a severity finding when he found Plaintiff had "substance induced mood disorder with mild depression when sober," is contradicted by the record. See infra Part B.4 for a discussion of the ALJ's determination that Plaintiff suffered from substance induced mood disorder.

impairment. See (R. at 334-38). The closest the ALJ came to making a finding on the issue of severity was incorporating his previous decision (R. at 335), in which he found Plaintiff did not have a severe mental impairment (R. at 20, 22-24). As discussed above, the ALJ was ordered on remand to gather new evidence and issue a new decision. Therefore, incorporating his previous decision does not meet his obligation to determine, based on all the evidence and the correct legal standard, whether Plaintiff has a severe mental impairment. See 20 C.F.R. §§ 404.1520(a)(3) (the ALJ "will consider all evidence in [the] case record"), (a)(4)(ii), 404.1520a (when evaluating the severity of a mental impairment the ALJ "must follow a special technique"); Scott, 2009 WL 54502, at *10.

        This Court has already recommended remand for the ALJ to properly apply the special technique, which is required at steps two and three of the sequential evaluation, therefore this Court does not reach the issue of substantial evidence at step two. See Johnson, 817 F.2d at 986 ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."). However, the Court notes that the Appeals Council, in their remand order, said of the ALJ's 1998 decision: "While the Administrative Law Judge found that the claimant has no severe mental impairment, the evidence of record does not support this finding" (R. at 346). The Appeals Council specifically directed the ALJ to "determine whether the claimant has a severe mental impairment independent substance abuse" (R. at 346). In this decision, the ALJ once again failed to determine whether Plaintiff has a severe mental impairment. On remand, the Court suggests the ALJ adhere to the Appeals Council remand order to determine whether Plaintiff has a severe mental impairment, by applying the proper legal standard. See 20 C.F.R. § 404.1520a.

### 4.   Plaintiff's Fourth Allegation: The ALJ Improperly Weighed the Medical Opinions and Substituted in His Own Opinion.

18.  Plaintiff argues that ALJ substituted his own opinion for that of medical sources. Plaintiff's Brief, p. 23. Plaintiff notes that the ALJ appeared to confuse the opinion of a registered nurse with that of a treating medical source. Plaintiff's Brief, p. 19. Plaintiff goes on to specifically argue that "the ALJ did not provide a sufficient rationale" and failed to analyze the factors in 20 C.F.R. § 404.1527(d) when he gave a nurse's opinion "controlling weight" and "accept[ed] [her] opinion over that of Dr. Sibley." Plaintiff's Brief, pp. 19-23.

It is well settled in the Second Circuit, that "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998). The ALJ "is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion or testified before him." Id. (quoting McBrayer v. Sec'y of Health & Human Servs., 712 F.2d 795, 799 (2d Cir.1983)); see Filocomo v. Chater, 944 F. Supp. 165, 170 (E.D.N.Y.1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings."). The ALJ may not make a medical determination. Rosa, 168 F.3d at 79.

Instead, the ALJ must "evaluate every medical opinion" he receives according to the regulations. 20 C.F.R. § 404.1527(d). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s)." 20 C.F.R. § 404.1527(a)(2); see also 20 C.F.R. § 404.1513(a) (listing licensed physicians and psychologists as acceptable medical sources), § 404.1513(d) (listing nurse practitioners as other sources). Unless the ALJ affords a "treating source's opinion controlling weight" he will "consider all of the following factors in deciding the weight [to] give to any medical opinion." 20 C.F.R. § 404.1527(d). Those factors are: whether the opinion is based

38

upon an examination, the existence of a treatment relationship, the supportability of the opinion,

the consistency of the opinion, the specialization of the source, and other factors. 20 C.F.R. §

404.1527(d)(1)-(6). Treating sources should generally receive more weight because these

sources are most likely to be "able to provide a detailed, longitudinal picture of [the claimant's]

medical impairment(s)." 20 C.F.R. § 404.1527(d)(2). If a treating source's opinion is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence" in the record, the ALJ will give it controlling

weight. Id. The regulations generally direct the ALJ to give more weight to the opinion of an

examining source over a non-examining source. 20 C.F.R. § 404.1527(d)(1). However, the

opinions of non-examining medical or psychological consultants and medical experts must also

be considered and are also weighed according to the 404.1527(d) factors. 20 C.F.R. §

404.1527(f)(2)(i)-(ii). The fact that an opinion comes from an "acceptable medical source" may

justify giving it greater weight than an opinion from an "other source." S.S.R. 06-03p, 2006 WL

2329939, at *5. However, the Social Security Administration ("SSA") has said that an "opinion

from a medical source who is not an 'acceptable medical source' may outweigh the opinion of

an 'acceptable medical source'" if the other source has seen the Plaintiff more often, had better

supporting evidence or a better explanation for her opinion. Id.

     Here, the ALJ assigned weight to only two *medical* opinions: that of Dr. Sibley and those

of Plaintiff's "treating sources at the VA."[44] See (R. at 338). As for Dr. Sibley's opinion, the ALJ

stated: "Dr. Sibley's opinion is accorded the same weight as a state agency review physicians

as to review of the record, with some additional weight as he observed the claimant during the

---

[44] The Appeals Council noted that the ALJ's 1998 decision failed to address or evaluate the opinions of
State agency consultative examiners, Dr. Seltenreich and Dr. Thalmann, and disability analyst, Ms.
Weingartner, which all indicated Plaintiff had a severe mental impairment (R. at 346). The Appeals
Council specifically directed the ALJ to "evaluate all the evidence of record, including all of the opinions of
the state agency medical consultants" (R. at 346). In this decision, the ALJ once again failed to evaluate
the opinions of the State agency consultants. However, Plaintiff has not objected to the ALJ's treatment of
these opinions and this Court will not address them further.

hearing, but did not examine or test him" (R. at 339). In assessing the weight to assign to Dr. Sibley's opinion, the ALJ considered that Dr. Sibley neither treated nor examined Plaintiff and that the ALJ was granting "greater weight" to Plaintiff's "current treating sources at the VA" than he was granting to Dr. Sibley (R. at 339). This Court detects no error in the ALJ's determination to grant less weight to Dr. Sibley than to Plaintiff's treating sources.

As for Plaintiff's objection that the ALJ improperly weighed the opinions of Suzanne Miller, R.N., it appears to the Court that the ALJ erroneously believed Nurse Miller's opinion was that of a treating physician. In 1998, Nurse Miller wrote on a State agency disability report: "Plaintiff will have a beneficial treatment period re: depression if he does not use alcohol/other drugs" (R. at 205). The ALJ never assigned weight to Ms. Miller's opinion as such, and in fact never mentioned her name. Nonetheless, the ALJ cited to Nurse Miller's opinion four times, apparently attributing her report and her opinion to a treating physician. See (R. at 336-38). The ALJ refers to Nurse Miller's opinion as coming from Plaintiff's "treating sources" (R. at 336), "treating sources at the VA" (R. at 338) and "claimant's treating VA physician" (R. at 338). The ALJ specifically gave Plaintiff's "treating sources at the VA" controlling weight (R. at 339).

The ALJ also attributed a diagnosis of "substance induced mood disorder" to Plaintiff's "treating sources at the VA" (R. at 339, 341). However, Plaintiff's treating psychiatrists never definitively diagnosed Plaintiff with substance induced mood disorder. Dr. Marra ultimately eliminated substance induced mood disorder as a diagnosis and Drs. Simor and Goodman were only considering it as a possible diagnosis (R. at 451, 455). The ALJ seems to misunderstand the meaning of "rule out" in medical parlance. The ALJ wrote, apparently referring to Dr. Goodman and Dr. Simor's notes, "[i]t is reported that a diagnosis of rule out substance-induced mood disorder was indicated" (R. at 339). The ALJ then found that Plaintiff "suffers from substance induced mood disorder, but is only mildly depressed" (R. at 339). However, in the medical context, "rule out" means a diagnosis is only possible, but not established. See Law v.

Barnhart, 439 F.Supp.2d 296, 307 n.3 (S.D.N.Y. 2006).

Although the ALJ purported to give Plaintiff's "treating sources at the VA" controlling weight, he ignored Dr. Marra's definitive diagnoses of depressive disorder not otherwise specified, polysubstance dependence in remission, and personality disorder not otherwise specified (R. at 451). He ignored Dr. Simor and Dr. Goodman's definitive diagnoses of depressive disorder not otherwise specified, alcohol dependence, polysubstance dependence in remission (R. at 455). He mischaracterizes Nurse Miller's opinion as that of a treating physician (R. at 336-38). And, he ignored Dr. Simor and Dr. Goodman's notation that they needed to "rule out" substance induced mood disorder and organic mood disorder, indicating they had not yet determined whether those diagnoses applied to Plaintiff (R. at 455). Certainly the ALJ may not make such medical determinations in place of Plaintiff's treating psychiatrists.

Thus, where the ALJ purported to give controlling weight to Plaintiff's treating physicians, but in effect substituted their opinions with his own diagnosis of "substance induced mood disorder," it appears to this Court that the ALJ "substitute[d] his own judgment for competent medical opinion." Balsamo, 142 F.3d at 81; see e.g., Abbensetts v. Barnhart, No. 01-CV-6596, 2002 WL 31095011, at *4 (E.D.N.Y. Sept. 19, 2002) (finding error where the ALJ purported to give great weight to the Plaintiff's treating physician but then ignored his opinion); Steficek v. Barnhart, 462 F.Supp.2d 415, 421 (W.D.N.Y. 2006) (finding error where the ALJ purported to "place importance" on a consulting examiner's opinion and give more weight to other medical opinions, but "effectively disregarded those opinions for little reason other than that they were inconsistent with *his* own assessment."). Therefore, this Court recommends remand so that the ALJ may carefully consider all the medical evidence and opinions from Plaintiff's treating psychiatrists and follow those opinions should he grant them controlling weight.

**5.   Plaintiff's Fifth Allegation: The ALJ Did Not Properly Assess the Impact of Plaintiff's Drug and Alcohol Abuse.**

41

19.   Plaintiff generally argues that the ALJ did not properly assess Plaintiff's drug and alcohol abuse. Plaintiff's Brief, pp. 20-27. Defendant argues that the record clearly establishes that when Plaintiff was sober he had the ability to work. Defendant's Brief, pp. 8-11.

### a.   The ALJ Omitted the Findings Required by 20 C.F.R. § 404.1535

Plaintiff argues the ALJ did not make the required findings of disability before concluding that substance abuse was material. Plaintiff's Brief, pp. 24-25, 27. Plaintiff appears to be arguing that the ALJ did not first find Plaintiff disabled before assessing the issue of materiality and also failed to state what limitations remained, absent drug and alcohol abuse.

The Act establishes that "an individual shall not be considered disabled . . . if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); Thus, "substance abuse becomes material to a benefit determination only after the claimant is found to be disabled" according to the sequential analysis. Roy v. Massanari, No. 3:01-CV-306, 2002 WL 32502101, at *2 n.3 (D. Conn. June 12, 2002); see 20 C.F.R. § 404.1535(a). The "plain text of the regulation" requires the ALJ to first use the standard sequential analysis to determine whether the claimant is disabled, "without segregating out any effects that might be due to substance use disorders." Day v. Astrue, No. 07-CV-157, 2008 WL 63285, at *5 (E.D.N.Y. Jan 3, 2008) (quoting Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir.2003)); see e.g., Orr v. Barnhart, (remanding to require the ALJ "to consider the ill effects that plaintiff's alcoholism had on her impairments and limitations" when determining the issue of disability and "only after finding that plaintiff is disabled, determine which impairments would remain if plaintiff stopped using alcohol"). The Plaintiff bears the burden of proving that substance abuse is not a contributing factor material to the disability determination. White v. Comm'r of Soc. Sec., 302 F.Supp.2d 170, 173 (W.D.N.Y. 2004).

The "key factor" in determining whether substance abuse is material is whether the

Plaintiff would meet the definition of disabled if he stopped using drugs or alcohol. 20 C.F.R. §
404.1535(b)(1). To make this determination, the ALJ will evaluate which of Plaintiff's limitations
would remain if he stopped using drugs or alcohol, "and then determine whether any or all of
[Plaintiff's] remaining limitations would be disabling." 20 C.F.R. § 404.1535(b)(2). If the
remaining limitations are not disabling, then drug and alcohol abuse is material, but if the
remaining limitations are disabling, then drug addiction and alcoholism are not material. 20
C.F.R. § 404.1535(b)(2)(i)-(ii).

Typical of his decision, the ALJ never clearly found Plaintiff disabled before analyzing
the materiality of his substance use disorder. Instead, the ALJ twice stated Plaintiff "may" meet
Listing 12.04 but alcoholism is "primary and material" (R. at 338, 341). This finding is
inadequate. See Day, 2008 WL 63285, at *5-6 (finding error where the ALJ did not clearly
determine whether the claimant was disabled and appeared to "conflate the substance abuse
analysis with the disability determination"); Lunan v. Apfel, No. 98-CV-1942, 2000 WL 287988,
at *8 (N.D.N.Y. March 10, 2000) (remanding, with the Commissioner's agreement, where the
ALJ failed to determine whether Plaintiff was disabled prior to finding alcoholism was material);
see also Brueggemann, 348 F.3d at 694 (explaining that the ALJ should not subtract the effects
of substance use disorders when initially determining whether a claimant is disabled, because
the initial inquiry "concerns strictly symptoms, not causes"). Therefore, this Court recommends
remand for the ALJ to properly assess Plaintiff's drug and alcohol use as required by the
regulations.

As for what limitations would remain if Plaintiff were to cease using drugs and alcohol,
the Court notes that in Kohler, the ALJ's failure to adhere to the special technique at steps two
and three frustrated the Second Circuit's review of his decision at subsequent steps in the
sequential analysis. Id. The Second Circuit stated:

Thus, it is not clear whether the ALJ adequately considered the entire record
when determining the severity of Kohler's impairment, or whether he might have

43

found it to equal the severity of a listed condition had he followed the regulations and made specific findings regarding Kohler's degree of limitation in each functional area. It also is not clear whether the ALJ would have arrived at the same conclusion regarding Kohler's residual functional capacity to perform work had he adhered to the regulations.

Kohler, 546 F.3d at 268.

In this case, it appears that the ALJ found Plaintiff had no significant limitations absent alcoholism (R. at 341). However, it is not clear that the ALJ would have reached the same conclusion had he properly followed the special technique for assessing Plaintiff's mental impairment. See also Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Function Capacity in Initial Claims, 1996 WL 374184, at * 4 (S.S.A. 1996) ("[T]he limitations identified in the [special technique] are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in" the Listings used in the special technique to evaluate the mental impairment at steps two and three). Therefore, this Court cannot reach the issue of whether the ALJ made the proper findings with regard to Plaintiff's remaining mental limitations.

Nonetheless, the Court notes that on remand, if the ALJ first determines that Plaintiff is disabled and assesses whether Plaintiff's drug and alcohol abuse are material, then he must "determine which of plaintiff's mental impairments would still exist if he stopped using alcohol and . . . determine whether these limitations would be disabling." Frederick v. Barnhart, 317 F.Supp.2d 286, 293 (W.D.N.Y.2004); see e.g., Frankhauser v. Barnhart, 403 F.Supp.3d 261, 277 (W.D.N.Y. 2005) (finding the ALJ's determination that Plaintiff's limitations were "far less marked" absent drug and alcohol abuse did not adequately indicate which of Plaintiff's impairments would remain and whether such limitations were disabling).

**b.  Dr. Sibley's Testimony Mandates a Finding of "Not Material"**

According to an SSA Emergency Teletype, when it is not possible to separate the limitations imposed by drug and alcohol abuse from those imposed by various mental disorders, it is appropriate to find substance abuse not material. Social Security Administration, "DAA Q&A Teletype," August 30, 1996, 27-29, http://www.ssas.com/daa-q&a.htm [hereinafter Emergency Teletype]. The SSA explained that a finding that drug and alcohol use was material should only be made when the evidence established an individual would not be disabled if he stopped using substances. Id. at 27, 31. Although the Second Circuit has not addressed whether the Emergency Teletype is binding authority, two district courts within the Second Circuit have found the teletype to be persuasive authority in that it represents the sound judgment of the Agency. Frankhauser v. Barnhart, 403 F.Supp.3d 261, 274 (W.D.N.Y. 2005); Ostrowski v. Barnhart, 2003 WL 22439585, at *4 (D. Conn. Oct. 10, 2003).

Here, Plaintiff argues that the question of whether substance abuse is material is a medical determination, which means that Dr. Sibley's opinion on the issue is dispositive. Plaintiff's Brief, p. 20-24. Plaintiff cites to White v. Comm'r of Soc. Sec. to support his assertion that materiality is a "medical determination"; however, White does not support this proposition. White, 302 F.Supp.2d at 174 (remanding for calculation of benefits where "the ALJ cited no record evidence to support his conclusion regarding the effects of plaintiff's alcoholism on his mental impairments"). The White court did not require a medical opinion that drug and alcohol abuse was material. Id. Instead, the court in White found it important that the ALJ cited no evidence whatsoever to support his conclusion that substance abuse was material. Id.

Plaintiff notes that Dr. Sibley could not separate out the limitations attributable to Plaintiff's mental impairments[45] and that other medical evidence, including both of the State's

---

[45] The Court notes that Dr. Sibley's testimony was somewhat ambiguous. When asked whether addiction was "material" Dr Sibley agreed that it was, but when asked the more specific question of whether, absent drug and alcohol abuse, Plaintiff's remaining impairments would be severe enough to prevent him from working, Dr. Sibley could not answer (R. at 581-82). Under questioning by Plaintiff's attorney Dr. Sibley agreed that he could not separate the limitations attributable to the substance impairments as opposed to

medical consultants, supported Dr. Sibley's testimony. Plaintiff's Brief, pp. 21-22. Plaintiff argues

that, under the Emergency Teletype, if Dr. Sibley's testimony is accepted, it mandates a finding

that Plaintiff's drug and alcohol abuse was not material. Although Plaintiff's argument is

somewhat unclear, the Court assumes that Plaintiff is arguing the ALJ should have assigned

greater weight or controlling weight to Dr. Sibley's testimony on the issue of materiality.

Unlike a treating physician's opinion, a medical expert's opinion is not entitled to

controlling weight. See Frankhauser v. Barnhart, 403 F.Supp.3d 261, 273 (W.D.N.Y. 2005)

(finding that the ALJ erred in relying on a medical expert's opinion rather than giving controlling

weight to the Plaintiff's treating physician). However, an ALJ may not summarily discount a non-

treating, non-examining physician's opinion either. As discussed above, the regulations direct

the ALJ to "evaluate every medical opinion" considering the factors listed in § 404.1527(d)

unless a treating source's opinion has controlling weight. 20 C.F.R. § 404.1527(d). This Court

has already determined that the ALJ properly determined the weight to assign to Dr. Sibley's

opinion. The ALJ gave several reasons for not completely deferring to Dr. Sibley's opinion to the

effect that Plaintiff met Listings 12.04, 12.08, and 12.09 (R. at 338-39). While Dr. Sibley was the

only medical source to opine on the issue of materiality and, as Plaintiff correctly notes, Dr.

Sibley was not contradicted by other evidence on this point, the regulations do not require the

ALJ to adopt Dr. Sibley's opinion on the issue of materiality. The ALJ's reasoning and

assignment of weight to Dr. Sibley's opinion were well within the regulatory requirements.

### 6.  Plaintiff's Sixth Allegation: The Court Should Remand Solely for Calculation of Benefits.

20.  Plaintiff argues the record is complete and this Court should therefore remand solely

for the calculation of benefits. Plaintiff's Brief, pp. 27-28. Specifically, Plaintiff argues that Dr.

---

the mental impairments (R. at 583). The ALJ's decision does not clarify the ambiguity as it repeats both
conclusions from Dr. Sibley's testimony. The ALJ states that Dr. Sibley "agreed that alcoholism was
primary and material" and, that Dr. Sibley "could not make a determination as to if [his mental
impairments absent drug and alcohol abuse] would prevent him from working" (R. at 338-39).

Sibley's medical opinion addressed all the relevant issues and was not contradicted by competent medical evidence. Id.

Under the Act, a district court may affirm, modify, or reverse an ALJ's decision, "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (sentence four). In the Second Circuit, remand only for the calculation of benefits is appropriate when "the record provides persuasive proof of disability," Pratts v. Harris, 626 F.2d 225, 235 (2d Cir. 1980), and there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision." Butts v. Barnhart, 388 F.3d 377, 385-86 (2d Cir. 2004) (quoting Rosa, 168 F.3d at 83). When the administrative record contains gaps or an improper legal standard was applied, it is appropriate to remand cases for further administrative proceedings. Id.; Rosa, 168 F.3d at 82-83. When remanding for further proceedings, the Second Circuit has directed district courts to consider the hardship on a claimant that would be caused by further delay and, when appropriate, order a time limit on further administrative proceedings. Butts, 388 F.3d at 387; see e.g., Jordan v. Barnhart, No. 04-CV-577, 2005 WL 226225, at *2 (E.D.N.Y. Feb. 1, 2005) (imposing a 60 day deadline where the claimant had to wait more than five years before her disability benefits claim was conclusively resolved by the Commissioner).

Here, although evidence the ALJ must reconsider, such as the opinions of treating psychiatrists, support Plaintiff's claim, they do not conclusively establish that Plaintiff is disabled. See Heath v. Astrue, No. CV-07-1238, 2008 WL 1850649, at *1 (E.D.N.Y. Apr. 24, 2008) (citing 20 C.F.R. § 404.1527(e)(2); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999)). Moreover, remanding for calculation of benefits is improper in this case because the ALJ must apply the proper legal standards including, the special technique, the regulations for weighing medical opinions, and the drug and alcohol regulations. See Butts, 388 F.3d at 385-86.

Nonetheless, Plaintiff's case has already been remanded once with the agreement of the Commissioner, and Plaintiff initially applied for DIB over ten years ago. Therefore, this Court

47

recommends the Commissioner be directed to complete further administrative proceedings within 60 days of the issuance of this order, and if upon remand, the ALJ denies Plaintiff's claim, the Commissioner be directed to issue a final decision within 60 days of any appeal. "If these deadlines are not observed, a calculation of benefits owed [Plaintiff] must be made immediately," Butts, 388 F.3d at 387, unless Plaintiff is the cause of the delay in meeting those deadlines. Heath, 2008 WL 1850649, at *2.

## Conclusion

21.  Based on the foregoing, it is recommended that the Court GRANT Plaintiff's motion in part, DENY Defendant's motion, and REMAND to the Commissioner for further proceedings consistent with this ruling.

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge

DATED: February 11, 2009

Syracuse, New York

## Orders

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with

the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** Thomas v. Arn, 474 U.S. 140 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir.1989); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir.1988).

**SO ORDERED**.

Victor E. Bianchini
United States Magistrate Judge

DATED: February11, 2009

Syracuse, New York